## UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS

| | |
|---|---|
| MICHAEL J. HARTLEIB, Derivatively on Behalf of Himself and All Others Similarly Situated,<br>24892 Hollow Circle<br>Laguna Hills, CA 92677-6026<br><br>        Plaintiff,<br><br>  vs.<br><br>DANEIL R. HESSE, ROBERT R. BENNETT, GORDON M. BETHUNE, LARRY C. GLASSCOCK, JAMES H. HANCE, JR., V. JANET HILL, FRANK IANNA, SVEN-CHRISTER NILSSON, WILLIAM R. NUTI, and RODNEY O'NEAL,<br>Serve At:<br>Sprint Headquarters<br>6200 Sprint Parkway<br>Overland Park, KS 66251<br><br>        Defendants,<br><br><br>  -and-<br><br>SPRINT NEXTEL CORPORATION,<br>Serve At:<br>Sprint Headquarters<br>6200 Sprint Parkway<br>Overland Park, KS 66251<br><br>        Nominal Defendant. | Case No. 12-cv-2266 KHV/KMH<br><br><br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

## INTRODUCTION

1.  Plaintiff, by and through his attorneys, brings this action derivatively on behalf of nominal defendant Sprint Nextel Corporation ("Sprint" or the "Company") and alleges upon

personal knowledge as to himself and his own acts, and as to all other matters based upon the investigation conducted by his attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings, documents, analyst reports, news reports, press releases, and other publicly-available information regarding the Company, as follows:

2.      This is a shareholder derivative action brought on behalf of the Company against the members of its Board of Directors ("Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and other violations of the law that occurred from at least July 2005 through the present ("Relevant Period").

3.      Sprint is mainly a holding company, with its operations primarily conducted by its subsidiaries. The Company's Series 1 voting common stock trades on the New York Stock Exchange ("NYSE") under the symbol "S." Sprint is a communications company offering a range of wireless and wireless communications products and services to individual consumers, businesses, government subscribers, and resellers.

4.      The Individual Defendants breached their fiduciary duties to the Company by permitting the Company to fail to collect and pay hundreds of millions of dollars in sales taxes on receipts from its sale of wireless telephone services since at least July 2005. For example, on April 19, 2012, the Attorney General for the State of New York filed a complaint against Sprint for the Company's failure to pay more than $100 million in New York sales taxes. Specifically, New York alleges that Sprint illegally avoided its New York sales tax obligations on about 25% of its receipts for "flat-rate" calling plans – plans for which customers pay a fixed monthly charge for a set or unlimited amount of calling time. New York further alleges that Sprint's decision to not collect and pay the required sales taxes in New York arose from a nationwide scheme to gain an advantage over its competitor wireless carriers, not by cutting its prices or

1

offering better service, but by failing to collect and pay sales taxes. The consequence of this scheme was that the Individual Defendants knowingly caused the Company to deprive state and local governments of tax revenues.

5.     The Individual Defendants, moreover, concealed this scheme from taxing authorities, Sprint's competitors, its customers, and its shareholders. As New York alleges, the Individual Defendants had actual knowledge that they were required to collect and pay sales taxes on the full amount of these fixed monthly charges, yet they chose to act contrary to the law. Indeed, from at least July 2005 through the present, the Individual Defendants knowingly caused the Company to fail to collect and pay the taxes on approximately one quarter of its revenue from these fixed monthly charges. The Individual Defendants also knowingly caused Sprint to submit false records and statements concealing this failure. Furthermore, the Individual Defendants also caused Sprint to falsely assert on its sales tax filings that the Company owed less in sales taxes than it actually did. Thus, Sprint owed substantially more than it publicly reported. New York alleges that even after New York tax authorities instructed Sprint that its tax avoidance scheme was illegal, Sprint not only failed to pay the back taxes it owed, but it has continued to underpay sales taxes and submit false tax returns. New York also alleges that unlike Sprint, Sprint's primary wireless competitors, including Verizon, AT&T, T-Mobile, and MetroPCS, have followed the law regarding these taxes.

6.     Additionally, Sprint has also misled millions of customers who purchased Sprint flat-rate plans. As New York alleges, in the Company's customer contracts, on its website, and elsewhere, Sprint represented that it would collect and pay all applicable sales taxes. Sprint, however, failed to pay all applicable sales taxes and concealed this fact from its customers and shareholders. Accordingly, the Individual Defendants breached their fiduciary duties to the

2

Company and have subjected the Company to hundreds of millions of dollars in charges, a substantial drop in the value of the Company's stock, adverse publicity, lawsuits, potential fines, investigation costs, and other occurrences harmful to the Company.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(2), as plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.   This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

8.     This Court has jurisdiction over each defendant because each defendant is either a corporation that conducts business in, and maintains operations in, this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

9.     Venue is proper in this Court under 28 U.S.C. §1391(a) because: (1) one or more defendants either reside in, or maintain executive offices in, this District; (2) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred within this District, and (3) defendants have received substantial compensation in this District by conducting business herein and by engaging in numerous activities that have had an effect in this District.

## PARTIES

10.    Plaintiff Michael J. Hartleib is a current shareholder of the Company and has been a shareholder of the Company during the Relevant Period.   Plaintiff is a citizen of the State of California.

11.     Nominal Defendant Sprint is a communications company offering a range of wireless and wireless communications products and services to individual consumers, businesses, government subscribers, and resellers.  Sprint is incorporated in the State of Kansas and its principal executive office is located at 6200 Sprint Parkway, Overland Park, Kansas, 66251.

12.     Defendant Daniel R. Hesse ("Hesse") is, and at all relevant times was, President, Chief Executive Officer ("CEO") and a director of Sprint.  Before becoming the President and CEO of Sprint on December 17, 2007, Hesse was Chairman, President, and CEO of Embarq Corporation.  Hesse served as CEO of Sprint's Local Telecommunications Division from June 2005 until the Embarq spin-off in May 2006.  Previously, Hesse served as Chairman, President and CEO of Terabeam Corp., a wireless telecommunications service provider and technology company, from 2000-2004.  Prior to serving at Terabeam Corp., Hesse spent 23 years at AT&T, during which he held various senior management positions, including President and CEO of AT&T Wireless Services.  Hesse has served as one of the Company's directors since December 2007.  Plaintiff is informed and believes, and thereupon alleges, that Hesse is a citizen of the State of Missouri.

13.     Defendant Robert R. Bennett ("Bennett") is, and at all relevant times was, a director of the Company.  Bennett is a principal of Hilltop Investments, LLC, a private investment company.  Bennett served as President of Discovery Holding Company from March 2005 until September 2008, when the company merged with Discovery Communications, Inc. creating a new public company.  Bennett also served as President and CEO of Liberty Media Corporation from April 1997 until August 2005 and continued as President until March 2006.  Bennett was with Liberty Media from its inception, serving as its principal financial officer and

4

in various other capacities. Prior to his tenure at Liberty Media, Bennett worked with Tele-Communications, Inc. and the Bank of New York. Bennett serves as a director of Discovery Communications, Inc., Demand Media, Inc., and Liberty Media Corporation. Bennett has served as one of the Company's directors since October 2006. Plaintiff is informed and believes, and thereupon alleges, that Bennett is a citizen of the State of Colorado.

14.     Defendant Gordon M. Bethune ("Bethune") is, and at all relevant times was, a director of the Company. Bethune is a retired Chairman and CEO of Continental Airlines, Inc., an international commercial airline company. Bethune served as CEO of Continental Airlines from 1994 and as Chairman and CEO from 1996 until December 30, 2004. Bethune is a director of Honeywell International Inc. and Prudential Financial, Inc. Bethune has served as one of the Company's directors since March 2004. Plaintiff is informed and believes, and thereupon alleges, that Bethune is a citizen of the State of Texas.

15.     Defendant Larry C. Glasscock ("Glasscock") is, and at all relevant times was, a director of the Company. Glasscock is the retired Chairman of the Board of WellPoint, Inc., a health benefits company. Glasscock served as President and CEO of WellPoint, Inc. from November 2004 (following the merger between Anthem, Inc. and WellPoint Health Networks Inc.) until June 2007 and as Chairman of WellPoint, Inc. from November 2005 until March 2010. Prior to Anthem's merger with WellPoint Health Networks in November 2004, Glasscock had served as Anthem's President and CEO since 2001 and also as Anthem's Chairman since 2003. Glasscock is a director of Simon Property Group, Inc., Sysco Corporation and Zimmer Holdings, Inc. Glasscock has served as one of the Company's directors since August 2007. Plaintiff is informed and believes, and thereupon alleges, that Glasscock is a citizen of the State of Indiana.

16.     Defendant James H. Hance, Jr. ("Hance") is, and at all relevant times was, a director of the Company. Hance is Chairman of the Board of Sprint. Hance also serves as a Senior Advisor to The Carlyle Group. Hance served as the Vice Chairman of Bank of America Corporation from 1993 until his retirement on January 31, 2005, and as the Chief Financial Officer ("CFO") of Bank of America Corporation from 1988 until April 2004. Hance is a director of Cousins Properties Incorporated, Duke Energy Corporation, Ford Motor Company and Morgan Stanley. Hance has served as one of the Company's directors since February 2005. Plaintiff is informed and believes, and thereupon alleges, that Hance is a citizen of the State of Florida.

17.     Defendant V. Janet Hill ("Hill") is, and at all relevant times was, a director of the Company. Hill is a principal with Hill Family Advisors. In 2010, Hill retired from Alexander & Associates, Inc., a corporate consulting firm, after serving as a Vice President since 1981. Hill also serves as a director of Wendy's/Arby's Group, Inc. and Dean Foods, Inc. Hill served as a director of Nextel Communications, Inc. from November 1999 until its merger with Sprint Corporation in August 2005, and she has served as one of the Company's directors since 2005. Plaintiff is informed and believes, and thereupon alleges, that Hill is a citizen of the State of Virginia.

18.     Defendant Frank Ianna ("Ianna") is, and at all relevant times was, a director of the Company. Ianna serves as CEO and a director of Attila Technologies LLC, a Technogenesis company incubated at Stevens Institute of Technology. Ianna retired from AT&T in 2003 after a 31-year career serving in various executive positions, most recently as President of Network Services. Following his retirement, Ianna served as a business consultant, executive and board member for several private and nonprofit enterprises. Ianna is also a director of Tellabs, Inc.

6

Ianna has served as one of the Company's directors since March 2009.  Plaintiff is informed and believes, and thereupon alleges, that Ianna is a citizen of the State of New Jersey.

19.     Defendant Sven-Christer Nilsson ("Nilsson") is, and at all relevant times was, a director of the Company.  Nilsson is the owner and founder of a private business advisory company.  Nilsson previously served in various executive positions for The Ericsson Group from 1982 through 1999, including as its President and CEO from 1998 through 1999.  Nilsson is a director of Ceva, Inc. and Assa Abloy AB.  Nilsson also serves as the Chairman of the Swedish Public Service Broadcasting Foundation and of the (Swedish) Defense Materiel Administration.  Nilsson has served as one of the Company's directors since November 2008.  Plaintiff is informed and believes, and thereupon alleges, that Nilsson is a citizen of the State of Connecticut.

20.     Defendant William R. Nuti ("Nuti") is, and at all relevant times was, a director of the Company.  Nuti serves as Chairman of the Board, CEO and President of NCR Corporation, a global technology company.  Nuti has served as CEO and President of NCR since August 2005, and as Chairman of NCR since October 2007.  Before joining NCR, Nuti had served as President and CEO of Symbol Technologies, Inc. from 2003 to 2005, and as President and Chief Operating Officer ("COO") of Symbol Technologies from 2002 to 2003.  Nuti joined Symbol Technologies in 2002 following more than 10 years at Cisco Systems, where he advanced to the dual role of senior vice president of the company's Worldwide Service Provider Operations and senior vice president of U.S. Theater Operations.  Nuti has served as one of the Company's directors since June 2008.  Plaintiff is informed and believes, and thereupon alleges, that Nuti is a citizen of the State of New York.

21.    Defendant Rodney O'Neal ("O'Neal") is, and at all relevant times was, a director of the Company. O'Neal serves as CEO and President of Delphi Automotive LLP, a global supplier of mobile electronics and transportation systems.   O'Neal has served as CEO and President of Delphi since January 2007.   O'Neal previously served as President and COO of Delphi from January 2005 until January 2007.   In 2000, O'Neal was named Executive Vice President of the former Safety, Thermal & Electrical Architecture Sector at Delphi.   In 2003, O'Neal was named president of the Dynamics, Propulsion, and Thermal Sector.   Previously, O'Neal served in a variety of domestic and international operating assignments for both Delphi and its former parent company, General Motors.   O'Neal is also a director of The Goodyear Tire & Rubber Company.   O'Neal has served as one of the Company's directors since August 2007. Plaintiff is informed and believes, and thereupon alleges, that O'Neal is a citizen of the State of Michigan.

22.    Defendants Hesse, Bennett, Bethune, Glasscock, Hance, Hill, Ianna, Nilsson, Nuti, and O'Neal are collectively referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

23.    By reason of their positions as officers and directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.   The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefit.

8

24.     Each director and officer owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information concerning the Company's revenue, margins, operations, performance, management, projections, and forecasts, so that the market price of the Company's stock would be based on truthful and accurate information.

25.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their executive, managerial, and/or directorial positions within the Company, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and misrepresentations made.

26.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

27.     To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

        a.     manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.      neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.      establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.      neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.      ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.      properly and accurately guide investors and analysts regarding the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.      remain informed regarding how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

10

28.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its shareholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.  The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

29.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein, and by failing to prevent employees and/or officers of the Company from taking such illegal actions.  In addition, the Company is now the subject of class action litigation alleging violation of federal securities laws, which necessitates the Company to incur excess costs arising from the Individual Defendants' wrongful course of conduct.

30.     Additionally, the Company has established a Code of Conduct ("Code") that applies to all employees of the Company.  The conduct of the Individual Defendants alleged herein constitutes a violation of the Company's Code.  The Code provides, among other things, the following:

> Failure to abide by any laws or policies, including the Code, can result in monetary damages, governmental sanctions and compromise Sprint's reputation. Violations of laws, policies or the Code may result in disciplinary action, up to

11

and including termination of your service and, in some cases, could lead to civil and criminal actions against the individual and Sprint. You are responsible for your own actions. You are never authorized to commit, or direct someone to commit, a violation of the Code or an illegal act. Additionally, you cannot use a contractor, agent, consultant, broker, distributor or other third party to perform any act prohibited by the Code or the law.

* * *

*We are responsible for:*
- Complying both with the letter and the spirit of all applicable laws, rules and regulations.
- Observing high ethical standards when conducting business on Sprint's behalf.
- Asking questions when in doubt about the appropriateness of a situation.
- Reporting known or suspected violations of any applicable laws, rules, regulations, policies and procedures.
- Certifying familiarity and compliance with the Code, its standards, policies and procedures.

* * *

Failure to abide by any laws or policies, including the Code, can compromise the reputation of Sprint and may also result in disciplinary action, up to and including termination of employment. Violations of the Code or illegal acts cannot be justified by saying that they "helped the bottom line," or were directed by a higher authority in the organization. Each employee is responsible for his or her actions. You are never authorized to commit, or direct someone to commit, a violation of the Code or an illegal act. Additionally, you cannot use a contractor, supplier, agent, consultant, broker, distributor or other third party to perform any act prohibited by the Code or the law.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

31.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their common plan or design.  In addition to

the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants

further aided and abetted and/or assisted each other in breach of their respective duties.

32.     During all times relevant hereto, the Individual Defendants collectively and

individually initiated a course of conduct that was designed to and did:

(a)     Conceal the fact that the Company was improperly misrepresenting its
financial results in order to allow defendants to artificially inflate the price of the
Company's shares;

(b)     Maintain the Individual Defendants' executive and directorial positions at
the Company and the profits, power, and prestige that the Individual Defendants
enjoyed as a result of these positions; and

(c)     Deceive the investing public, including shareholders of the Company,
regarding the Individual Defendants' management of the Company's operations,
the Company's financial health and stability, and future business prospects,
specifically related to the Company's financial condition that had been
misrepresented by the Individual Defendants throughout the Relevant Period.

33.     In furtherance of this plan, conspiracy, and course of conduct, the Individual

Defendants collectively and individually took the actions set forth herein.

34.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or

common course of conduct during the Relevant Period.   During this time, the Individual

Defendants caused the Company to conceal material facts, misrepresent its financial results, and

violate applicable laws.   In addition, the Individual Defendants also made other specific, false

statements about the Company's financial performance and future business prospects, as alleged

herein.

35.     The purpose and effect of the Individual Defendants' conspiracy, common

enterprise, and/or common course of conduct was, among other things: (1) to disguise the

Individual Defendants' breaches of fiduciary duty, abuse of control, gross mismanagement,

waste of corporate assets, and unjust enrichment; (2) to conceal adverse information concerning

13

the Company's operations, financial condition, and future business prospects; and (3) to artificially inflate the price of the Company's stock so that the Individual Defendants could protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

36.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise, and/or common course of conduct alleged herein.

37.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs alleged herein.  In taking such actions to substantially assist the commission of the wrongdoing alleged herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

38.     The Individual Defendants breached their fiduciary duties to the Company by permitting the Company to fail to collect and pay hundreds of millions of dollars in sales taxes on receipts from its sale of wireless telephone services since at least July 2005. The Individual Defendants did not disclose that Sprint had failed to collect and pay hundreds of millions of dollars in sales taxes.  For instance, in the Company's 2010 Form 10-K filed on February 27, 2012, Sprint stated that "during 2011, a $59 million expense was recorded as a result of the effect of changes in corporate state income tax laws.  Of the $59 million, $38 million was

14

recognized within 'State income taxes, net of federal income tax effect' and $21 million was recognized as 'Change in valuation allowance' . . . ." The Individual Defendants failed to disclose in this filing or in other SEC filings or public statements during the Relevant Period that the Company failed to pay hundreds of millions of dollars in sales taxes to state and local governments.

39.    For example, on April 19, 2012, the Attorney General for the State of New York filed a complaint against Sprint for the Company's failure to pay more than $100 million in New York sales taxes. Specifically, in its complaint, New York alleges the following:

**Sprint's Flat-Rate Wireless Calling Plans**

In New York, Sprint sells wireless calling plans through its subsidiary entities Sprint Spectrum L.P., Nextel of New York, Inc., and Nextel Partners of Upstate New York, Inc. These plans are all branded as "Sprint" plans and are centrally developed and overseen by Sprint Nextel Corporation.

Throughout the period from July 2005 to the present, Sprint has offered for sale to New York customers wireless calling plans that include voice services in exchange for fixed monthly charges. The voice services provided under these plans consist of the ability of Sprint's customers to use Sprint's wireless network to make phone calls for a set number of minutes, or for an unlimited number of minutes.

The fixed monthly charge for these voice services is billed to customers regardless of whether the customers actually use the network during the month, regardless of how much they use the available minutes, and regardless of whether calls are made to people or phones within the same state – intrastate calls – or people or phones in other states – interstate calls. Under these plans, calls within the monthly number of minutes are not billed on a perminute basis.

In short, the fixed monthly charges that Sprint's customers pay for wireless voice services under Sprint's flat-rate plans are for *access*, not for specific calls; hence Sprint identifies these charges on customer invoices as "monthly recurring *access* charges" (emphasis added).

Sprint charges its customers differently for calls that are *not* within the fixed monthly charge. When customers use more than the allowed minutes in a month

15

for phone calls, they are charged for that separate usage – or "overage" – on a per-minute basis.

By way of illustration, Sprint currently offers a calling plan under which a customer is charged $39.99 a month for the ability to use – or access – Sprint's network for up to 450 minutes of calling time per month. Overage minutes cost 45 cents each. The $39.99 will be charged if the customer makes no calls at all, uses one minute of calling time or uses 449 minutes of calling time. If the customer uses 451 minutes of calling time, he or she will have to pay the $39.99 fixed monthly charge plus a $0.45 usage charge for the overage.

Sprint's customers typically purchase flat-rate calling plans by signing a contract with Sprint. These contracts are provided by Sprint and are not subject to negotiation by the customer. They usually have a term of one or two years. A customer who chooses to cancel a contract before the term ends is subject to an early termination fee payable to Sprint. Usually, these early termination fees are in excess of $200.

Sprint represents in its contracts and on its website that it will collect all applicable state and local sales taxes on the customer's behalf and pay the amount collected to the government.

Since before July 2005, Sprint has sent its New York customers monthly invoices for services provided under its flat-rate plans. These invoices state the fixed monthly charge for the plan, and they separately state the charges for any overage minutes. They also set forth a charge for sales taxes, but they do not indicate how the sales taxes are calculated.

The invoices do not indicate that Sprint has calculated sales taxes on less than the full fixed monthly charge for voice services.

The invoices do not indicate to customers that Sprint is charging less sales taxes than required by law, and that customers can be held liable for any resulting underpayment.

**Sprint's Obligation to Pay New York Sales Taxes on Its Flat-Rate Calling Plans**

Since at least August of 2002, New York State and localities within New York State require and have required the payment of sales taxes on the *full amount* of fixed monthly charges for wireless voice services sold to customers in New York. Sprint, as the provider of the services, is required to collect the sales taxes from its customers and pay them to the State.

16

For example, when Sprint receives payment of a fixed monthly charge of $39.99 for 450 minutes of wireless voice services, Sprint is required to collect and pay sales taxes on the entire $39.99.

New York Tax Law contains a specific provision concerning how sales taxes are to be applied to fixed monthly charges for wireless voice services. According to N.Y. Tax Law Section 1105(b)(2), sales taxes are to be applied to:

> the receipts from every sale of mobile telecommunications services provided by a home service provider, other than sales for resale, that are voice services, or any other services that are taxable under subparagraph (B) of paragraph one of this subdivision, sold for a fixed periodic charge (not separately stated), whether or not sold with other services.

This provision has been in effect continuously since August 2, 2002.

The Tax Law, and this section in particular, clearly requires the payment of sales taxes on the *full amount* of fixed periodic charges for wireless voice services sold by companies like Sprint to New York customers, as follows: (a) Sprint is a "home service provider" because it is a facilities-based carrier with which mobile telecommunications customers contract for the provision of mobile telecommunications service; (b) The mobile telecommunications services sold by Sprint under the flat-rate plans are not sold for resale; (c) under Sprint's flat-rate plans, Sprint sells wireless voice services for a fixed periodic charge; (d) Sprint does not separately state or otherwise break out any portions of the fixed periodic charge for voice services in invoices or other communications with customers; (e) Sprint's fixed monthly charges for wireless voice services are not for "other services that are taxable under subparagraph (B) of paragraph one of [Section 1105(b)]."

On July 30, 2002, the New York State Department of Taxation & Finance (the "New York Tax Department") issued guidance on this provision in a "Technical Services Bureau Memorandum" (the "2002 TSB-M"). There, it explained that for mobile telecommunications, "the *total charge* for a given number of minutes of air time that may be used for voice transmission is subject to sales tax under new section 1105(b)(2)" (emphasis added).

The 2002 TSB-M gave a concrete example demonstrating that the amended law requires the payment of New York sales taxes on the full amount of the fixed monthly charges for wireless voice services, regardless of how – or whether – a customer uses them:

> *Example 1*: Mr. Smith buys a cellular calling plan from a home service provider which includes up to 2500 minutes for use for a

17

flat-rate charge of $49.95 per month. The contract provides that additional charges will apply for calling minutes that exceed the minutes allowed under the plan.

In November 2002, Mr. Smith does not exceed the calling minutes allowed under the plan, and is charged $49.95 for the month. *Such charge is subject to sales tax under section 1105(b)(2) of the Tax Law, regardless of whether the calls made under the plan were intrastate, interstate, or international calls.* (2002 TSB-M at 3) (emphasis added).

The various counties within the State of New York, along with New York City and certain school districts and other local entities, impose sales taxes on the identical services. The sales tax rate imposed on such services varies by locality, and the taxes in each must be paid in addition to the New York State sales taxes.

Under New York sales tax law, the obligations are different with respect to certain telecommunications services that are *not* sold for a fixed periodic charge. For overage minutes that are charged to customers on a per-minute usage basis, Sprint and other wireless carriers are required to collect and pay New York state and local sales taxes only when such calls are int*r*astate, and are not required to collect and pay them on such calls that are int*er*state.

The New York Tax Department's 2002 TSB-M guidance further illustrated this situation in its next example:

> *Example 2:* The facts are the same as in *Example 1*, except that Mr. Smith exceeds the calling minutes allowed under the plan. *The $49.95 flat-rate charge is subject to tax under section 1105(b)(2) of the Tax Law*, and the separate charges for intrastate calls included in the excess minutes are subject to sales tax under section 1105(b)(1)(B) of the Tax Law. The separate charges for interstate or international calls included in the excess minutes are not subject to sales tax. (2002 TSB-M at 3-4) (emphasis added).

New York tax law also spells out how wireless carriers can apply sales taxes when selling "bundles" of services for a fixed periodic charge where some of the services included in the bundle would be taxable if they were sold separately from the bundle (such as voice services sold for a fixed periodic charge), while other services would *not* be taxable if they were sold separately from the bundle (such as Internet services).

As a general matter, if any one component service included in a bundle is subject to sales taxes when sold on its own, then the charge for the entire bundle is subject to sales taxes. New York tax law, however, allows a wireless carrier, in defined situations, to break out from the bundle, or "unbundle," the charge so it

does not have to collect and pay sales tax on a charge for a service that would not be subject to sales tax if it were sold separately and not as a component of a bundle of services. This unbundling is also referred to as "component taxation."

For example, Sprint's $39.99 flat-rate plan for access to Sprint's wireless network for 450 minutes of calling time is sold in another variation: for an additional $30, the customer can include unlimited Internet access in the plan. The plan thus consists of two components: wireless voice services and Internet access. Because a charge for Internet access is not, on its own, subject to New York state and local sales taxes, Sprint is permitted (if it follows all the rules set forth in New York law) to unbundle the Internet portion of the overall charge and not collect and pay sales taxes on that Internet portion.

New York's unbundling rules are set forth in section 1111(*l*) of the New York Tax Law. Under that section, wireless providers are permitted to treat separately for sales tax purposes certain components of a bundled charge for mobile telecommunication services, so long as the charges are *not* for voice services, and so long as service provider uses an "objective, reasonable and verifiable standard for identifying each of the components" of a bundled charge. The New York Tax Department's 2002 TSB-M guidance also illustrated this situation with examples:

> *Example 7*: Mrs. Johnson's place of primary use is an address in Buffalo,
> NY. She receives both cellular telephone service and Internet access service from her home service provider. The home service provider separately states the charge on Mrs. Johnson's bill for the cellular service and for the Internet access service. *The charge for the cellular service is subject to sales tax*, while the charge for Internet access service (so long as reasonable) is not, because it is separately stated.

> *Example 8*: The facts are the same as in *Example 7*, but the charges for the cellular service and the Internet access service are not separately stated. In this instance, the total charge is considered a receipt from the charge for mobile telecommunications service and is subject to sales tax, under section 1105(b)(2).

> *Example 9*: The facts are the same as in *Example 8*, except the home service provider properly identifies, accounts for, and quantifies the receipts from each of the components of the total charge attributable to the cellular service and the Internet access service based on objective, reasonable and verifiable standards. *In this instance, the home service provider is only required to collect and pay over sales tax that is attributable to the receipts associated with the cellular service*. The portion of the receipt

> attributable to the Internet access service is excluded from taxation.
> (2002 TSB-M at 3-4) (emphasis added).

Unbundling cannot be used to avoid sales tax on a component service that the state or local government has chosen to tax; it can only be used to separate non-taxable services from taxable ones. A wireless carrier cannot, under the guise of unbundling, avoid sales tax on a taxable service. Because New York law treats fixed monthly charges for wireless voice services as a single, irreducible, taxable service that cannot be broken out for sales tax purposes, Sprint violated the law by failing to collect and pay New York state and local sales taxes on the full amount of the charges.

**Sprint's Decision to "Unbundle" Its Plans Nationwide**

Beginning in July 2005, Sprint began to implement a nationwide program of unbundling its wireless offerings for sales tax purposes. As part of this program, it began treating part of its fixed monthly access charges for wireless voice services as if they were charges for "interstate" calls charged on a per-minute basis, and, in states like New York, not collecting and paying sales taxes on that part. The fixed monthly charges for access to Sprint's network, however, were and are not taxable in the same way as per-minute usage charges.

Internally, Sprint acknowledged that its approach to unbundling in this way was aggressive and risky because tax authorities throughout the country could object to the practice. However, it served Sprint's interest of gaining a competitive advantage by having uniquely low sales tax collections, and thus low overall billing for its plans.

Under New York law, Sprint's approach was and is unequivocally illegal.

**Sprint's Decision to Unbundle Its Plans Nationwide to Gain a Competitive Advantage**

From the outset, Sprint's decision to unbundle its calling plans nationwide was driven by its desire to gain an advantage over its competitors by reducing the amount of sales taxes it collected from its customers and, thereby, appearing to be a low-cost carrier while reducing revenues for state and local governments and not reducing its own revenues.

Before 2002, Sprint began to consider unbundling its flat-rate plans that included wireless voice services. Responsibility for implementing the plan fell to Sprint's business unit called the State and Local Tax Group. This group was and is headed by a Sprint Assistant Vice President who reports to Sprint's Vice President of Tax, who, in turn, reports to Sprint's Chief Financial Officer. In 2005, the group had 108 permanent employees. It also had resources that gave it ready access to

tax laws, guidance and other materials to aid in the analysis and understanding of Sprint's state and local sales tax obligations, including its obligations under the New York Tax Law.

Initially, Sprint did not recognize the financial benefit of component taxation. One Sprint employee reported that Sprint had earlier considered unbundling Internet access from combined Internet/voice plans, but "the project was scrapped because there wasn't enough bang for the buck."

By 2002, Sprint came to realize, however, that if it collected less in sales taxes than its competitors by deeming part of its fixed monthly charges to be non-taxable, it could effectively lower the cost of its service as compared with its competitors, without hurting its own bottom line, and thereby obtain a competitive advantage.

On or about May 15, 2002, a member of Sprint's State and Local Tax Group prepared Sprint's "business case" for component taxation. The business case stated that unbundling would "provide a competitive advantage over wireless carriers who aren't able to perform component taxing."

To further its plan, Sprint encouraged its competitors to take a conservative path and be open and transparent with regulators with regard to component taxation, while Sprint quietly took another path. Also in 2002, the head of Sprint's State and Local Tax Group warned other companies at a Communications Tax Executive Conference at Vail, Colorado that unbundling posed risks of audits by taxing authorities and litigation, and that they should protect themselves from these risks by entering into agreements with taxing authorities or by seeking clarifying legislation before they began to unbundle. Sprint itself did not seek out any such agreements with taxing authorities in New York, nor did it seek additional legislation in New York.

In 2003, Sprint's Senior State and Local Tax Counsel presented to another industry group – the Wireless Tax Group – about "Sprint's Bundling Experience." He told other wireless carriers that "unbundling for taxes causes significant assessment risk." He told the group that his "marching orders" at Sprint were to "mitigate tax issues by pursuing legislation or pre-audit agreements that allow for component taxing."

Sprint did not follow those "marching orders" in New York.

Around the time Sprint was advising competitors how they should approach component taxation, Sprint conducted competitive surveillance, and learned that other major wireless carriers were working to unbundle by breaking out charges for Internet access from charges for wireless voice services, but were not seeking

21

to break out their charges for wireless voice services into smaller portions for sales tax purposes.

By September 2004, Sprint was refining its consideration of how to approach unbundling and component taxation. One approach, which Sprint identified as "conservative," involved unbundling only Internet access from voice services. This was the approach to component taxation that Sprint understood some its competitors were pursuing.

Another approach, which Sprint viewed as aggressive and risky, and which would allow Sprint to be a "low cost tax leader in the wireless industry," involved unbundling "interstate usage" from within its fixed monthly charge for wireless voice services. Because the fixed monthly charge is not divisible based on customer usage, unbundling in this way required Sprint to come up with an arbitrary method of allocating the charge into sub-parts.

At the time Sprint was considering these approaches to component taxation, the majority of Sprint's revenue from its wireless plans was coming from its fixed monthly charges for wireless voice services. Treating some portion of these charges as "interstate usage" presented the greatest opportunity for Sprint to reduce its collection of taxes, and improve its competitive standing nationwide because many states, including New York, do not charge sales taxes on receipts from charges for interstate calls billed on a per-minute basis.

An internal Sprint analysis from January 2005 showed that, if Sprint unbundled only its Internet access charges, it would reduce sales taxes by about $623,000 per month. The analysis further revealed that if Sprint also broke out charges for wireless voice services into what it deemed taxable and non-taxable categories, it would reduce sales taxes by an additional $4.6 million per month. Thus, if competitors were breaking out only Internet access charges, Sprint concluded that its plans would be about $4.6 million per month cheaper, collectively, than competitors' plans by paying less money to the government, without any cost to Sprint.

In early 2005, Sprint's Assistant Vice President of State and Local Tax, its Director of External Tax, and other Sprint employees met and decided to recommend to more senior Sprint executives that the company adopt the aggressive approach to unbundling that included breaking out its fixed monthly charge for wireless voice services and treating part of the charge as if it were for interstate usage billable on a per-minute basis.

The senior executives authorized that approach.

Sprint made its decision to break out its fixed monthly charges for voice services before it completed the merger with Nextel Corporation in August of 2005. After

22

the merger was complete, Sprint used the same approach to unbundling plans sold by Nextel, and justified this approach internally by citing to the competitive advantage it would achieve by unbundling in the same way as the pre-merger Sprint plans. It described the "quantitative impact" of the move as "decreas[ing] churn," and described a "key benefit" as "lower churn." "Churn" is a measure used within the telecom industry to refer to the loss of subscribers. A low churn rate is favorable to a wireless carrier. Sprint and other telecom carriers publicly disclose their churn rates, and analysts and investors closely monitor churn. Sprint incentivizes its employees to lower churn by increasing employee bonuses when Sprint's churn rate declines.

Other major wireless carriers, unlike Sprint, did not break their fixed monthly charges for wireless voice services into subparts for sales tax purposes.

In New York alone, by under-collecting and under-paying New York state and local sales taxes, Sprint plans were made $100 million less expensive than its competitors' plans from mid-2005 to the present.

**Sprint Classifies Arbitrary Percentages of Its Fixed Monthly Charges as Non-Taxable**

Sprint used data systems to generate its customer invoices and to create its sales tax filings. It could accurately collect and pay taxes only if it used the categories within the systems appropriately. One of the systems allows Sprint to break out its charges into various taxing categories, and contains settings that will cause the system to treat charges placed in a category as "taxable" or "non-taxable" for any given taxing jurisdiction. The vendor for this taxing system provided Sprint with these taxable and non-taxable decisions for each tax category, and Sprint reviewed these taxability decisions. Where Sprint disagreed with the vendor, it overrode the vendor's taxability decisions.

Before starting to unbundle its wireless calling plans, Sprint used the taxing system by classifying the full amount of its fixed monthly access charges for wireless voice services as "network access." "Network access" is defined in the system's reference manual as "a charge to have access to a cellular or paging network." Sprint's fixed monthly charges for wireless voice services were just such charges.

Once Sprint began its unbundling program, however, it did not use the taxing system for purposes of collecting and paying sales taxes in the way it was designed. While the system was set up to treat the full amount of a fixed monthly charge for wireless voice services as "network access," Sprint manipulated the system by classifying part of the charge as being in a category called "usage airtime: interstate," which was set up and used by Sprint to be nontaxable in New York.

The taxing system's category for "usage airtime: interstate" was not set up to capture parts of a fixed periodic charge, but rather to capture per-minute usage charges – such as overage charges – that were for interstate calls. The reference manual for the data system defined "usage (or airtime) charges" as "per minute charges for using a wireless network." The portion of its fixed monthly charges that Sprint classified as "usage airtime: interstate" did not represent such per-minute usage charges.

The taxing system's vendor considered charges for "usage airtime: interstate" (as the system defined it) to be non-taxable for purposes of New York state and local sales taxes and set up the system to reflect that fact. Sprint knew of that non-taxable setting and did not change it, even though it knew that it was not using this category for its intended purpose.

**Sprint's Allocations Between Taxable and Non-Taxable Categories Were Arbitrary**

The percentage figures that Sprint used in dividing up its fixed monthly charges for wireless voice services between the "network access" and "usage airtime: interstate" categories varied by calling plan and over time in an arbitrary and inconsistent manner.

For its Sprint Spectrum plans, from July 2005 to October 2008, Sprint classified 28.5% of its fixed monthly charges for wireless voice services as "airtime usage: interstate." For its Nextel of New York plans, from about April 2006 through October 2008, it classified 13.7% as "airtime usage: interstate." For its Nextel Partners of Upstate New York plans, from about May 2006 to October 2008, Sprint represents, without support, that it classified 15% as "airtime usage: interstate." For all of its plans, since October 2008 until the present, it has classified 22.5% as "airtime usage: interstate."

For example, Sprint would have applied New York sales taxes to a Sprint Spectrum plan with a $39.99 fixed monthly charge for access to Sprint's network for 450 minutes of calling time in August of 2006 as follows: It would have classified 28.5%, or $11.40, as "usage airtime: interstate" and not paid New York state and local sales taxes on it. It would have classified the remaining $28.59 as "network access" and paid taxes only on that part.

In deciding to use these various percentages, Sprint did not apply values for the wireless network access it was providing to its New York customers, or any other customers around the country. It also did not apply values for the minutes that New York or other customers actually used for interstate calls or intrastate calls, or values for the minutes that were not used but were available under the plans.

24

Instead, these allocations of Sprint's fixed monthly charges were arbitrary. At times, for example, Sprint calculated a percentage for "interstate usage" from an unrelated federal telecommunications surcharge, but Sprint did not use that same percentage in calculating its obligations for that federal surcharge, nor did Sprint modify how it allocated its charges for sales tax purposes when the federal government changed the percentage.

Even though Sprint has set up its system this way, it has not consistently adhered to its percentage allocations. For some of its plans for certain periods of time, Sprint cannot tell what it taxed or why, and it lacks records reflecting its method of determining sales taxes in New York and elsewhere. For example, Sprint lacks data that could show how it broke out its fixed monthly charges for voice services offered under plans sold by Nextel Partners (including plans sold by Nextel Partners of Upstate New York).

Sprint also took action to conceal that it failed, at times, to apply its own percentage allocations as it intended. It knew that disclosure would likely meet with resistance from taxing authorities nationwide and present the company with an increased nationwide audit risk.

For example, by 2009, Sprint had discovered that, for certain plans sold around the country, including in New York, it had failed to break out its fixed monthly charges for wireless voice services and treat part as non-taxable. In other words, Sprint discovered that it did not adhere completely to its own unbundling program, and therefore accidentally collected and paid the correct amount of sales taxes on a number of its plans. As a result, Sprint collected and paid about $30 million in taxes from its customers around the nation that it had not intended to collect or pay.

Once Sprint discovered this issue, employees not familiar with the nature of Sprint's unbundling suggested that Sprint seek a refund from taxing authorities of this $30 million "overpayment" on behalf of its customers. This idea was promptly rejected by higher level Sprint tax employees who understood the importance of concealing both Sprint's unbundling practices and the state of its record keeping. Sprint's Director of Telecom Tax wrote in an e-mail: "My 2 cents worth is that, based on what [another Sprint employee] has laid out here, I don't think we should [seek a refund] - i.e., we can't change our books and records after the fact to support a refund." Sprint's Senior State Tax Counsel then added to the discussion that "Sprint is already taking some risk with unbundling. Our risks are exponentially increased if we try to pursue refunds when we didn't jump through the hoops on unbundling." After this internal consideration, Sprint did not seek refunds, nor did it notify consumers of the issue.

**Sprint's Avoidance of Over $100 Million in New York Sales Taxes**

Sprint has not collected and paid state and local sales taxes required by New York law because it excluded about a quarter of its fixed monthly charges to New York customers for wireless voice services from its calculation of New York sales taxes.

From July 2005 through the present day, Sprint has treated that excluded portion of the monthly charges as if it were not part of a fixed periodic charge for gaining access to Sprint's wireless network for a set number of minutes of calling time, which is what it was. Instead, Sprint inaccurately treated it as if it were a charge for per-minute usage for interstate calls and did not pay sales taxes on it in New York (and elsewhere) because per-minute usage charges for interstate calls are not subject to New York state and local sales taxes.

Based on Sprint's approach, the three taxpayer defendant entities did not pay New York state and local sales taxes as follows: (a) for flat-rate plans sold by defendant Sprint Spectrum L.P., Sprint did not collect or pay New York state and local sales taxes on 28.5% of its fixed monthly charges for wireless voice services, from July 2005 until October 2008; (b) for flat-rate plans sold by defendant Nextel of New York, Inc., Sprint did not collect or pay New York state and local sales taxes on 13.7% of its fixed monthly charges for wireless voice services, from about April 2006 through October 2008; (c) for flat-rate plans sold by defendant Nextel Partners of Upstate New York, Inc., Sprint did not collect or pay New York state and local sales taxes on an amount that Sprint cannot confirm, but has represented as being 15% of its fixed monthly charges for wireless voice services, from about May 2006 through October 2008; (d) for flat-rate plans sold by all three of these companies, from October 2008 to the present, Sprint has not collected or paid New York state and local sales taxes on 22.5% of its fixed monthly charges for wireless voice services.

As a result of Sprint's treatment of its fixed monthly charges for voice services, Sprint deprived New York state and local governments of more than $100 million of tax revenue.

Under the New York Tax Law, such underpayments are also subject to interest, currently at an annual rate of 14.5%, and penalties of double the amount of fraudulent underpayments or up to 30% of other underpayments.

The amounts of Sprint's under-collection and underpayment of taxes continues to grow. Sprint still does not collect and pay New York state and local sales taxes on the full amount of its fixed monthly charges for voice services.

**Sprint Knew It Was Violating Its New York Sales Tax Obligations**

At the time Sprint made the decisions to unbundle its flat-rate plans and to treat a part of its fixed monthly charges for wireless voice services as non-taxable in

New York, and at all times since, Sprint was fully aware of the New York Tax Law provisions concerning its obligation to pay sales taxes with respect to fixed monthly charges for wireless voice services.

In 2002, when amendments to the New York Tax Law were under consideration with respect to telecommunications sales taxes, Sprint was part of an industry group that actively lobbied for the law to match its interests. As part of these lobbying efforts, an internal lobbyist at Sprint, together with other industry representatives, met with representatives of the New York Tax Department shortly before the May 29, 2002 enactment of the amendments, in an effort to influence the legislation.

In connection with these lobbying efforts, Sprint reviewed the pending legislation.

Sprint's lobbyists were also in communication with the New York Tax Department concerning the guidance the Department issued just before the sales tax law amendments became effective. An outside lobbyist for Sprint obtained a copy of the draft of the 2002 TSB-M from the New York Tax Department and then forwarded it to Sprint's internal lobbyist, who then forwarded it to the leaders of Sprint's internal State and Local Tax Group. According to the internal lobbyist, Sprint was being given an opportunity to comment on the TSB-M. Sprint reviewed the draft of the 2002 TSB-M. The draft was in all material respects the same as the final version of the 2002 TSB-M issued on July 30, 2002.

By July 2005, when Sprint began to implement its decision not to pay New York sales taxes on the full amount of its fixed monthly charges to New York customers for wireless voice services, Sprint had reviewed New York sales tax law, including New York Tax Law Sections 1105(b) and 1111($l$). Similarly, it made the decision only after reviewing the guidance from the New York Tax Department in the 2002 TSB-M.

Sprint's Senior State and Local Tax Counsel, who was charged with understanding state and local tax law, when asked "how many times would you say you have read [the relevant New York tax law]," including Section 1105(b), testified "a hundred or more."

Sprint did not seek, and has not sought, any guidance from the New York Tax Department about the application of the 2002 amendments or other New York law concerning sales taxes on the fixed monthly charges for wireless voice services or other bundled mobile telecommunications products. It chose not to despite the fact that the New York Tax Department routinely provides such guidance to taxpayers and that Sprint has, in the past, consulted with the New York Tax Department on other tax matters.

27

While it considered how to unbundle its flat-rate plans, Sprint did not seek or obtain any advice from outside attorneys or others outside the company with respect to its New York sales tax obligations concerning its fixed monthly charges for wireless voice services.

Internally, Sprint did not prepare any memoranda or other documents analyzing these obligations.

Sprint continues to not collect and pay New York state and local sales taxes on the full amount of its receipts from its fixed monthly charges for wireless voice services, despite being specifically informed of the illegality of this practice by a field-auditor of the New York Tax Department in 2009, and then, in 2011, by a senior enforcement official of the New York Tax Department.

**Sprint's Knowingly False Records and Statements**

Sprint has repeatedly caused to be made false records and statements material to its obligations to collect and pay New York sales taxes on the full amount of the fixed monthly charges it received from New York customers for wireless voice services.

Since it began its unbundling program, Sprint has submitted to the New York Tax Department each month tax forms – including Forms ST 809, ST 810 and Schedule T – that have purported to spell out the amount of sales taxes due to be paid by Sprint to the New York State and local governments. The sales tax submissions are made separately for defendants Sprint Spectrum L.P., Nextel of New York, Inc. and Nextel Partners of Upstate New York, Inc. All of these sales tax submissions are prepared and submitted centrally by employees of Sprint Nextel Corporation.

Each and every one of the submitted tax forms, for all periods since Sprint began its unbundling program has been false in that not one states the accurate amount of sales taxes due. Instead, these statements understate the taxes due because Sprint illegally and fraudulently failed to apply sales taxes to the part of its fixed monthly charges that it internally chose to classify as non-taxable "usage airtime: interstate" in its data systems.

At the time Sprint submitted each of these tax forms and made these false statements as to each of the various taxing jurisdictions, it had actual knowledge of what was required by New York sales tax law, that it was not paying state and local sales taxes on its full fixed monthly charges for wireless voice services, and that such breaking out of the fixed monthly charges was not permitted under New York tax law. Sprint thus knew that its repeated statements of the sales taxes it owed were false because they severely understated the tax due.

At a minimum, Sprint acted in deliberate ignorance of the truth or falsity of the information it included in its sales tax filings or it recklessly disregarded the truth or falsity of the information.

Each of Sprint's New York sales tax filings and each of its representations to the various taxing authorities within the State was material to the obligation of Sprint to pay the correct amount of sales taxes for the tax period represented by each filing.

Each of Sprint's New York sales tax filings and each of its representations to the various taxing authorities within the State was also material to Sprint's obligation to pay its total past underpayment of the sales taxes. Each filing continued to conceal (a) the existence of the underpayment in past periods, and (b) Sprint's ongoing and continuing conduct of submitting false tax filings. Each filing was a false record and statement that ensured that the taxing authorities of the state and local governments would not know of the underpayment and therefore would not seek to collect the moneys owed.

When Sprint made each of its New York sales tax filings and the separate representations in them for each taxing jurisdiction, Sprint made it less likely that the state or local governments would know about, or collect, or attempt to collect or receive any payment of Sprint's obligation to pay the total underpayment that had accumulated at that time.

**Sprint Misled Its New York Customers That It Was Collecting and Paying All Applicable Sales Taxes**

Sprint also misled its New York customers.

From July 2005 until the present, Sprint has had over three million customers in New York who purchased flat-rate calling plans. It currently has about 1.82 million such customers.

These customers have entered into contracts with Sprint to purchase their plans, and they were locked into these plans for one or two years by early termination fees that Sprint would charge customers who terminated their plans before the contract period was over.

In its contracts with these customers, on its website and elsewhere, Sprint represented that it would collect and pay all applicable sales taxes on its calling plans. As described above, however, it did not do so. Sprint's representations in the contracts, on its website and elsewhere were false because Sprint knew it would not collect and pay the applicable sales taxes in New York.

29

Contrary to its promises, Sprint failed to collect and pay sales taxes on substantial portions of the fixed monthly charges for voice services under its flat-rate calling plans. As a result of this non-payment, Sprint left its New York customers liable for those unpaid amounts of sales taxes under New York law.

At no point did Sprint disclose to its New York customers that it was leaving them liable for the sales taxes that Sprint failed to collect from the customers and pay to the government, as promised.

Before Sprint began unbundling, members of its State and Local Tax Group and its marketing group considered in the early part of July 2005 whether to communicate with customers about the fact that Sprint was unbundling and that the unbundling would affect taxes for some customers. They jointly opted not to communicate the change. Sprint's Director of External Tax was concerned that disclosing the information would "drive too many calls" to Sprint's customer care division.

In November 2005, just months after Sprint began unbundling, a Sprint employee in the Customer Billing Services department questioned a member of Sprint's State and Local Tax Group about whether unbundling was "presented to the customer as part of the Subscriber agreement, shown in the invoice and/or available to Customer Care Rep." The response was simply that "we have not educated our customers on how we are de-bundling transactions for their tax relief."

Sprint continues to misinform its current and prospective customers about sales taxes, and to subject them to undisclosed sales tax liability even today.

40.     News reports indicated that the Company's stock price fell upon news of New York's lawsuit.  For instance, an April 19, 2012 *Reuters* article entitled "NY state sues Sprint for more than $300 million over taxes" reported the following:

(Reuters) - The state of New York on Thursday sued Sprint Nextel Corp for more than $300 million, accusing the company of tax fraud by deliberately not collecting or paying millions of dollars of taxes for its cell phone service.

Sprint, the third-biggest U.S. mobile service provider, failed to bill customers for more than $100 million in taxes for its wireless services over seven years, according to New York Attorney General Eric Schneiderman.

Schneiderman filed his complaint, based on whistleblower information, in New York State Supreme Court on Thursday, and said the case is the first tax

enforcement action filed under the state's False Claims Act. The lawsuit seeks three times the amount of underpaid tax, plus penalties.

Sprint said it "categorically denies" the allegations, and intends to defend itself against the lawsuit.

"We have collected and paid over to New York every penny of sales taxes on mobile wireless services that we believe our customers owe under New York state law," it said. "With this lawsuit, the attorney general's office is claiming New York consumers, who already pay some of the highest wireless taxes in the country, should pay even more."

Schneiderman said Sprint's decision not to collect and pay taxes was part of a nationwide effort by the Overland Park, Kansas-based company to lure customers from rivals such as AT&T Inc and Verizon Wireless, and make its service $4.6 million less expensive per month.

"Everyone else had no trouble figuring out what the tax law was, except Sprint," Schneiderman said on a telephone press conference.

He added that internal documents showed the scheme arose from Sprint's seeking to "maintain an advantage over its rivals."

Schneiderman said the whistleblower is Empire State Ventures, which does investigations and is involved in many false claims cases. The attorney general said he wanted to encourage whistleblowers to scrutinize any state rip-offs.

Under the False Claims Act, whistleblowers may be eligible to receive up to 25 percent of any money recovered by the government as a result of information they have provided.

Wall Street analysts expect Sprint Nextel to report a first- quarter loss of $1.296 billion, or 41 cents per share on April 25.

Sprint shares fell 13 cents, or 5.2 percent, to $2.39 on the New York Stock Exchange in afternoon trading.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

41.     Plaintiff brings this action derivatively in the right, and for the benefit, of the

Company to redress injuries suffered, and to be suffered, by the Company as a direct result of the

breaches of fiduciary duty, abuse of control, gross mismanagement, waste of corporate assets and

unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  The Company is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction in this Court that it would not otherwise have.

42.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights.

43.     Plaintiff is the owner of the Company's common stock and was the owner of the Company's common stock at all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

44.     At the time that this action was commenced, the Company's Board consisted of the following directors: Hesse, Bennett, Bethune, Glasscock, Hance, Hill, Ianna, Nilsson, Nuti, and O'Neal.

45.     As a result of the facts set forth herein, plaintiff has not made any demand on the Company's Board to institute this action against the Individual Defendants.  Such demand would be a futile and useless act with respect to each and every one of the Individual Defendants because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action for the following reasons:

    a.     Defendant Hesse is not an independent director because he has served as the Company's President and CEO.  Hesse, moreover, received more than $11.8 million in compensation in 2011, more than $9 million in compensation in 2010, and more than $12.3 million in compensation in 2009.  Accordingly, Hesse is not disinterested and cannot fairly evaluate a demand;

    b.     Additionally, defendant Hesse lacks independence from defendants Bethune, Hill, Nuti, and O'Neal as they are defendants who are not disinterested and/or

independent and who exert influence over the compensation for defendant Hesse by virtue of their positions as members of the Compensation Committee. The Compensation Committee annually reviews and approves corporate goals and objectives relevant to the compensation for defendant Hesse, evaluates performance in light of those goals and objectives, and approves a level of compensation based upon these evaluations. This lack of independence renders these defendants incapable of impartially considering a demand to commence and vigorously prosecute this action;

c.      Defendants face a substantial likelihood of being held liable for breaching their fiduciary duties of loyalty and good faith as alleged herein, and are therefore incapable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action;

d.      The Company's non-employee directors have received, and continue to receive, substantial compensation in the form of cash and stock option awards. These defendants are interested in maintaining their positions on the Board so as to safeguard their substantial compensation and stock options. The following chart illustrates the substantial compensation that these directors have received, which demonstrates that demand upon such individuals would be futile:

| 2011 DIRECTOR COMPENSATION | | | | |
|---|---|---|---|---|
| DIRECTOR | FEES EARNED OR PAID IN CASH | STOCK AWARDS | OTHER COMPENSATION | TOTAL |
| Robert R. Bennett | $138,000 | $110,000 | - | $248,000 |
| Gordon M. Bethune | $127,000 | $110,000 | - | $237,000 |
| Larry C. Glasscock | $154,000 | $110,000 | $1,500 | $265,500 |
| James H. Hance, Jr. | $278,000 | $110,000 | $2,500 | $390,500 |
| V. Janet Hill | $128,000 | $110,000 | - | $238,000 |
| Frank Ianna | $123,750 | $110,000 | - | $233,750 |
| Sven-Christer Nilsson | $106,000 | $110,000 | - | $216,000 |

| 2011 DIRECTOR COMPENSATION | | | | |
|---|---|---|---|---|
| William R. Nuti | $109,000 | $110,000 | - | $219,000 |
| Rodney O'Neal | $109,000 | $110,000 | - | $219,000 |

e.     The entire Board and senior management participated in the wrongs complained of herein.   For the reasons described herein, the Company's directors are not disinterested or independent.   Pursuant to their specific duties as Board members, each was charged with the management of the Company and the conduct of its business affairs.   Each of the above referenced defendants breached the fiduciary duties they owed to the Company and its shareholders in that they failed to prevent and correct the dissemination of the Company's false and misleading statements.   Thus, the Board cannot exercise independent objective judgment in deciding whether to bring this action or whether to vigorously prosecute this action because its members are interested personally in the outcome since their actions have subjected the Company to millions of dollars in potential liability for violations of applicable securities laws;

f.     Defendant Hesse certified certain of the Company's SEC filings. Accordingly, demand is futile as Hesse faces a substantial likelihood of liability for breach of fiduciary duties owed to the Company;

g.     Defendants Bennett, Glasscock, Hance, and Ianna were aware of the Company's ongoing unlawful and improper business practices and the dissemination of materially false and misleading statements and, yet, still permitted the Company to portray to the public the Company's false and misleading information despite their heightened fiduciary obligations as members of the Company's Audit Committee.   As such, defendants Bennett, Glasscock, Hance, and Ianna breached their fiduciary duties of loyalty and good faith to the Company.   Additionally, the failure of these defendants to perform their duties as members of

34

the Audit Committee with loyalty and in good faith raises a substantial likelihood of non-exculpated personal liability on their part.   Specifically, the Company's Audit Committee Charter provides the following:

**SPRINT NEXTEL CORPORATION**
**AUDIT COMMITTEE CHARTER**

## I.   COMMITTEE PURPOSE

The primary purposes of the Audit Committee are to assist the Board in fulfilling its oversight responsibilities with respect to:

(a)   the integrity of Sprint Nextel Corporation's ("Sprint Nextel") financial statements and related disclosures as well as related accounting and financial reporting processes,

(b)   Sprint Nextel's compliance with legal and regulatory requirements,

(c)   the independent registered public accounting firm's qualifications, independence, audit and review scope, and performance,

(d)   the audit scope and performance of the internal audit function,

(e)   Sprint Nextel's Ethics and Compliance Program, and

(f)   Enterprise Risk Management Program.

The Audit Committee is to act on behalf of the Board and to oversee all material aspects of Sprint Nextel's accounting and financial reporting processes and the quality and integrity of Sprint Nextel's financial statements and related disclosures, including oversight of the activities of Sprint Nextel's management and of the independent registered public accounting firm as described in this paragraph. Sprint Nextel's management is responsible for the preparation, presentation and integrity of Sprint Nextel's financial statements and related disclosures, the appropriateness of the accounting and reporting policies used by Sprint Nextel, and the effectiveness of the accounting and financial reporting processes. The independent registered public accounting firm is responsible for auditing those financial statements and controls.

An important part of the Audit Committee's purpose is the coordination with other Board Committees and the fostering of a free, open and clear avenue of communication between management, the independent registered public accounting firm, the internal audit function, the general counsel, the chief ethics officer and the Board.

## II.   COMMITTEE COMPOSITION

The Audit Committee will be comprised of at least three directors. All members of the Audit Committee will satisfy the director independence and audit

35

committee qualification requirements of the New York Stock Exchange ("NYSE"), applicable law and regulations and Sprint Nextel's Corporate Governance Guidelines.

All members of the Audit Committee will be financially literate, as such qualification is interpreted by the Board in its business judgment. At least one member will be an "audit committee financial expert" as defined by the rules and regulations of the Securities and Exchange Commission ("SEC") and at least one member (who may also be the audit committee financial expert) will have accounting or related financial management expertise in accordance with the NYSE listing standards, as the Board interprets such qualification in its business judgment.

The members and chair of the Audit Committee will be appointed by the Board and will serve until removed by the Board or their successors have been duly appointed and qualified.

## III.   COMMITTEE MEETINGS

The Audit Committee will meet as often as required to fulfill its responsibilities as set forth in this Charter, but no less than four times a year. Meetings may be held in person or telephonically. The chair or his or her designee will preside over all meetings. The Audit Committee will meet regularly with management, the head of the internal audit function, and the independent registered public accounting firm in separate executive sessions to discuss any matters that the Audit Committee or any of these groups believes should be discussed privately. When necessary, the Audit Committee will meet with the general counsel and the chief ethics officer in separate executive sessions. Unless otherwise requested by the Audit Committee, the chief ethics officer or general counsel, as appropriate, or unless otherwise required under Sprint Nextel's procedures, any executive sessions with the general counsel and chief ethics officer will occur only at regularly scheduled meetings. The Audit Committee will report regularly to the Board on its decisions, recommendations and other activities.

## IV.   PRINCIPAL COMMITTEE RESPONSIBILITIES AND DUTIES

To fulfill its purposes, responsibilities and duties, the Audit Committee will:

Independent Registered Public Accounting Firm

1. Possess sole authority for the appointment, retention, termination, compensation, evaluation and oversight of the independent registered public accounting firm. The Audit Committee will make an annual determination whether to retain the current independent registered public accounting firm or appoint a new independent registered public accounting firm. The

independent registered public accounting firm will report directly to the Audit Committee.

2.  Approve all engagement fees and terms with the independent registered public accounting firm for all audit, review and other services. The Audit Committee will also have sole authority to pre-approve all permissible engagements with the independent registered public accounting firm. The Audit Committee may delegate pre-approval authority to one or more of its members, but any decisions made by the member to whom such authority is delegated must be reported to the Audit Committee at its next meeting. All engagements will be pre-approved in accordance with Sprint Nextel's Financial Policy on Pre-Approvals of Audit, Audit-Related, Tax and Non-Audit Services.

3.  Before the annual audit, review and discuss with the independent registered public accounting firm the scope and general extent of the annual audit and related work and the fees to be paid for these services.

4.  Receive from the independent registered public accounting firm, on an annual basis, a formal written statement concluding that the independent registered public accounting firm is independent, in addition to delineating all relationships between the independent registered public accounting firm and Sprint Nextel and its executive officers and directors, consistent with applicable regulations. Review and discuss with the Board, as necessary, and the independent registered public accounting firm, on a periodic basis, any disclosed relationships or services between the independent registered public accounting firm and Sprint Nextel or its executive officers or directors, or any other circumstances that may impact the objectivity and independence of the independent registered public accounting firm.

5.  Oversee the quality-control process of the independent registered public accounting firm by, at least annually, obtaining and reviewing reports from the independent registered public accounting firm describing the firm's internal quality-control procedures; any material issues raised by the most recent internal quality control review, or peer review, of the independent registered public accounting firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, respecting one or more independent audits carried out by the firm and any steps taken to deal with any such issues. At least annually, conduct an evaluation of the independent registered public accounting firm's qualifications, performance and independence, taking into account the opinions of management and the internal audit function. The evaluation of the independent registered public accounting firm will include the review and evaluation of the lead partner of such firm. The Audit Committee will review

and discuss with the Board its determinations with respect to the independent registered public accounting firm.

6.  In addition to ensuring proper rotation of the lead audit partner and concurring audit partner of the independent registered public accounting firm, as well as any other relevant member of the audit engagement team, consider, periodically, whether the regular rotation of Sprint Nextel's independent registered public accounting firm is appropriate or desirable.

7.  Set hiring policies for employees or former employees of the independent registered public accounting firm.

8.  Regularly review separately with each of Sprint Nextel management, the independent registered public accounting firm and the internal audit function any audit problems or difficulties encountered during the course of the review or audit, including any restrictions on the scope of work or access to required information, any significant issue discussed with the independent registered public accounting firm's national office, and, where applicable, management's response.

9.  Review and resolve any significant disagreement between management and the independent registered public accounting firm or the internal audit function in connection with the preparation of the financial statements.

10. Review the impact of pronouncements of the Financial Accounting Standards Board, SEC and other governing or regulating bodies on Sprint Nextel's financial statements.

Financial Reporting and Processes

1.  Review and discuss the annual audited financial statements and quarterly financial statements to be included in Sprint Nextel's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with management and the independent registered public accounting firm, including a review of Sprint Nextel's specific disclosures under "Management Discussion and Analysis of Financial Condition and Results of Operations." Recommend to the Board whether the audited financial statements should be included with the Annual Report on Form 10-K.

2.  Review the integrity of Sprint Nextel's financial reporting processes, both internal and external, with input from the independent registered public accounting firm and the internal audit function.

3.  Receive reports from management regarding all significant deficiencies and material weaknesses in the design or operation of Sprint Nextel's internal

control over financial reporting which are reasonably likely to adversely affect Sprint Nextel's ability to record, process, summarize and report financial information.

4.   Discuss with management the Chief Executive Officer's and Chief Financial Officer's evaluations of Sprint Nextel's disclosure controls and procedures.

5.   Review the following on a timely basis with management and the independent registered public accounting firm:
•      The review reports of Sprint Nextel's interim financial statements;
•      The annual audit report(s), or proposed audit report(s);
•      Significant issues regarding accounting principles and financial statement presentations, including changes in Sprint Nextel's selection or application of accounting principles and the effect of existing or proposed regulatory and accounting initiatives, and issues as to the adequacy of Sprint Nextel's internal control over financial reporting, including any material changes in internal control over financial reporting and any special steps adopted in light of any identified material weaknesses in internal controls;
•      Analyses prepared by management or the independent registered public accounting firm setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements;
•      Critical accounting policies and practices to be used;
•      Any material written communications between the independent registered public accounting firm and management;
•      Management's annual report on internal control over financial reporting;
•      The reports of the results of such other examinations outside the course of the independent registered public accounting firm's normal audit procedures that may be undertaken from time to time; and
•      Such other matters required by Sprint Nextel's Corporate Governance Guidelines and applicable regulations, including the NYSE listing standards.

6. Prior to public release, discuss generally with management the type and presentation of information to be disclosed in earnings press releases and earnings guidance (including the use of any "pro forma" or "adjusted" non- GAAP information), and Sprint Nextel's guidance concerning future financial performance, as well as financial information provided to analysts and rating agencies.

Internal Audit Function
1.      Consider and approve management's proposed appointment, termination or transfer of the head the internal audit function.
2.      Provide input regarding the annual performance appraisal and compensation of the head of the internal audit function.

3.   Annually review the internal audit function's audit plan and objectives resources, qualifications, independence and reporting relationships.

4.   Review the internal audit function's activities on a quarterly basis, including any plan changes, objective changes, and resource updates.

5.   Review any significant matters contained in reports from the internal audit function, as well as management's procedures for implementing accepted recommendations made by either internal audit or the independent registered public accounting firm.

Ethics and Legal Compliance

1.   Review with Sprint Nextel's general counsel any legal matters that could have a significant impact on Sprint Nextel's financial statements, and review with Sprint Nextel's chief regulatory officer any material reports received from regulatory or governmental agencies.

2.   Review reports by management regarding any fraud, whether or not material, that involves management or other employees who have a significant role in Sprint Nextel's internal control over financial reporting.

3.   Review the scope and status of the Ethics and Compliance Program and other procedures designed to promote integrity and an ethical culture, and compliance with laws, regulations and Sprint Nextel policies, including The Sprint Nextel Code of Conduct and the Securities Law Compliance Program. Review management's monitoring of these programs. The chief ethics officer shall have the authority to communicate personally with the Audit Committee and shall provide an update at least annually on the results of the compliance reporting system and any material issues regarding compliance with laws or Company policy.

4.   Consider and approve management's proposed appointment, termination or transfer of the chief ethics officer.

5.   Consider and approve management's proposed appointment of the stock trading compliance officer.

6.   Adopt and implement a policy and procedures (A) to receive, handle and retain complaints regarding accounting, internal accounting controls or auditing matters, and (B) to provide for confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters. Review the treatment of any complaints received under this policy.

7.   Assist the Board in oversight of Sprint Nextel's compliance with legal and regulatory requirements.

General

1.   Annually review and reassess the adequacy of this Charter.

2.   Prepare the Audit Committee report to be included in Sprint Nextel's annual proxy statement.

3.   With input from the Finance Committee, review guidelines and policies with respect to risk assessment and risk management. Annually report to the Board regarding Sprint Nextel's enterprise risk management program.

4. Conduct or oversee any investigation appropriate to fulfilling its responsibilities, using direct access to the independent registered public accounting firm as well as any Sprint Nextel employee, as appropriate.

5. Annually evaluate the Audit Committee's performance, using procedures established or approved by the Nominating and Corporate Governance Committee.

6. Perform any other activities consistent with this Charter, Sprint Nextel's Amended and Restated Bylaws, Amended and Restated Articles of Incorporation, and applicable law, as the Board considers appropriate and delegates to the Audit Committee.

7. Delegate authority to subcommittees when appropriate.

**V.    ACCESS TO RESOURCES**

The Audit Committee will have appropriate resources and authority to discharge its responsibilities as required by law. The Audit Committee will have full access to Sprint Nextel's records, officers, employees and outside advisors as necessary to perform its duties. The Audit Committee also has the authority to engage, at Sprint Nextel's expense, the services of independent counsel or other independent advisors as it determines necessary to perform its duties.

h.      Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein thereby rendering demand futile;

i.      The Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties;

j.      In order to bring this suit, all of the Company's directors would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand;

k.      The acts complained of constitute violations of the fiduciary duties owed by the Company's officers and directors and these acts are incapable of ratification;

41

l.      Each of the Individual Defendants authorized and/or permitted the false statements disseminated directly to the public and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if they instituted it;

m.      Any suit by the Company's current directors to remedy these wrongs would likely expose the Individual Defendants and the Company to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants; thus, the Individual Defendants are hopelessly conflicted in making any supposedly independent determination whether to sue themselves; and

n.      The Company has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for the Company any part of the damages that the Company suffered and will suffer thereby.

46.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for the Company for any of the wrongdoing alleged by plaintiff herein.

47.     Plaintiff, moreover, has not made any demand on shareholders of the Company to institute this action since demand would be a futile and useless act for the following reasons:

b.      The Company is a publicly held, with over 3 billion shares outstanding and thousands of shareholders;

     c.      Making demand on such a number of shareholders would be impossible for plaintiff who has no way of determining the names, addresses, or phone numbers of shareholders; and

     d.      Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

48.     Furthermore, the conduct alleged herein could not have been the product of good faith business judgment, and each of the Individual Defendants faces a substantial likelihood of liability for breaching their fiduciary duties because, through their intentional misconduct, they have subjected the Company to substantial damages. Such actions by the Individual Defendants cannot be protected by the business judgment rule. Accordingly, making a pre-suit demand on the Individual Defendants would be futile.

## COUNT I
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION)

49.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

50.     The Individual Defendants – and particularly the Individual Defendants that served as members of the Company's Audit Committee – owed a fiduciary duty to the Company to supervise the issuance of the Company's press releases and public filings to ensure that they were truthful and accurate and that such filings conformed to applicable securities laws. The Individual Defendants, however, breached their fiduciary duties by allowing the Company to issue and disseminate misleading statements and filings.

43

51.    As members of the Board, the Individual Defendants were directly responsible for authorizing, permitting the authorization of, or failing to monitor the practices that resulted in violations of applicable laws as alleged herein.    Each of the Individual Defendants had knowledge of, actively participated in, approved, and/or acquiesced in the wrongdoing alleged herein or abdicated his or her responsibilities with respect to this wrongdoing.    The alleged acts of wrongdoing have subjected the Company to unreasonable risks of losses and expenses.

52.    Each of the Individual Defendants' acts in causing or permitting the Company to disseminate material misrepresentations and omissions to the investing have subjected the Company to liability for violations of applicable laws, and therefore were not the product of a valid exercise of business judgment, constituting a complete abdication of their duties as officers and/or directors of the Company.    As a result of the Individual Defendants' breaches, the Company's reputation in the business community and financial markets has been irreparably tarnished.

## COUNT II
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY)

53.    Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

54.    The Individual Defendants owed the Company fiduciary obligations.    By reason of such fiduciary obligations, the Individual Defendants specifically owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care, reasonable inquiry, oversight, and supervision.

55.    The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight, and supervision by engaging

44

in a sustained and systematic failure to exercise their oversight responsibilities and to ensure that

the Company complied with applicable laws, rules, and regulations.  As a direct and proximate

result of the Individual Defendants' failure to adequately perform their fiduciary obligations, the

Company has sustained significant damages monetarily and injury to its corporate image and

goodwill.

56.     As a result of the misconduct alleged herein, the Individual Defendants are liable

to the Company.  Plaintiff, moreover, has no adequate remedy at law.

**COUNT III**
**(AGAINST THE INDIVIDUAL DEFENDANTS FOR GROSS MISMANGEMENT)**

57.     Plaintiff incorporates by reference each of the preceding paragraphs as though

they were set forth in full herein.

58.     The Individual Defendants had a duty to the Company and its shareholders to

prudently supervise, manage, and control the operations, business, and internal financial

accounting and disclosures of the Company.  The Individual Defendants, however, by their

actions, and by engaging in the wrongdoing alleged herein, abandoned and abdicated their

responsibilities and duties with regard to prudently managing the business of the Company in a

manner consistent with the duties imposed upon them by law.  By committing the misconduct

alleged herein, the Individual Defendants breached their duties of due care, diligence, and candor

in the management and administration of the Company's affairs and in the use and preservation

of the Company's assets.

59.     During the course of the discharge of their duties, the Individual Defendants were

aware of the unreasonable risks and losses associated with their misconduct.  Nevertheless, the

Individual Defendants caused the Company to engage in the scheme described herein which they

45

knew had an unreasonable risk of damage to the Company, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged the Company, thereby causing damage to the Company.

## COUNT IV
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR CONTRIBUTION AND INDEMIFICATION)

60.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

61.     The Company is alleged to be liable to various persons, entities and/or classes by virtue of the facts alleged herein that give rise to defendants' liability to the Company.

62.     The Company's alleged liability on account of the wrongful acts, practices, and related misconduct alleged arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Individual Defendants, and the Company is entitled to contribution and indemnification from each Individual Defendant in connection with all such claims that have been, are, or may in the future be asserted against the Company by virtue of the Individual Defendants' misconduct.

## COUNT V
### (AGAINST THE INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL)

63.     Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

64.     The Individual Defendants' conduct, as alleged herein, constituted an abuse of their control over the Company.

65.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## COUNT VI
## (AGAINST THE INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS)

66.   Plaintiff incorporates by reference each of the preceding paragraphs as though they were set forth in full herein.

67.   The Individual Defendants' conduct, as alleged herein, constituted a waste of the corporate assets of the Company.

68.   As a direct and proximate result of the Individual Defendants' abuse of control, the Company has suffered, and will continue to suffer, damages for which the Individual Defendants are liable.  Plaintiff, moreover, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

i.   Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

ii.   Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

iii.   Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: May 9, 2012

By:      /s/   James P. Frickleton
        James P. Frickleton, KS # 20602

GLANCY BINKOW & GOLDBERG LLP
LIONEL Z. GLANCY *(pro hac vice pending)*
MICHAEL M. GOLDBERG *(pro hac vice pending)*
EX KANO S. SAMS II *(pro hac vice pending)*
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

THE BRISCOE LAW FIRM, PLLC
WILLIE C. BRISCOE *(pro hac vice pending)*
The Preston Commons
8117 Preston Road, Suite 300
Dallas, Texas 75225
Telephone: (214) 706-9314
Facsimile: (214) 706-9315

BARTIMUS, FRICKLETON, ROBERTSON &
GORNY, P.C.
JAMES P. FRICKLETON, KS #20602
11150 Overbrook Road, Suite 200
Leawood, KS  66211
Telephone: (913) 266-2300
Facsimile: (913) 266-2366

*Counsel for Plaintiff*

## VERIFICATION

I, Michael J. Hartleib, hereby verify and declare that I have reviewed the

Shareholder Derivative Complaint ("Complaint") in this action.  The allegations

contained within the Complaint are true and correct to the best of my knowledge,

information, and belief, and I have authorized the filing of this Complaint.

I declare under penalty of perjury that the foregoing is true and correct.


DATED: May 6 , 2012

Michael J. Hartleib